MEHDI RAZAVI AND ALEXANDRA L. RAZAVI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Razavi v. Commissioner
Docket No. 20086-91
United States Tax Court
T.C. Memo 1993-624; 1993 Tax Ct. Memo LEXIS 639; 66 T.C.M. (CCH) 1784; December 27, 1993, Filed *639 Decision will be entered under Rule 155. For petitioners: J. Timothy Bender and Joseph P. Alexander. For respondent: Mario J. Fazio and Richard S. Bloom. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Additions to Tax Year
Deficiency
Section 6653(a)(1)(A) [1]
Section 6653(a)(1)(B)
1986
$ 20,309
$ 1,039 *
1987
11,123
574 *
* 50 percent of the interest due on the portion of the
underpayment attributable to negligence. Respondent determined
that $ 1,872 and $ 1,717 of the underpayments for the years 1986
and 1987, respectively, were attributable to negligence.
The sole issue for decision is whether claimed rental losses for the tax years 1986 and 1987 are disallowed under section 280A(c)(5). *640 We hold that the claimed rental losses are disallowed for both years. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners, Mehdi Razavi (Razavi) and Alexandra L. Razavi, husband and wife, resided in Pepper Pike, Ohio, when they filed the petition. Petitioners filed joint Federal income tax returns for the years 1986 and 1987. On December 13, 1985, Razavi entered into a contract with South Seas Plantation Development Company (SSPD) to purchase a $ 355,000 resort condominium unit, unit number 1661 (Unit 1661 or Unit), located at Land's End Village, South Seas Plantation Resort (SSPR), Captiva Island, Florida. An addendum to this contract was executed by Razavi on December 13, 1985, and by a representative of SSPD on January 7, 1986. Unit 1661, a 1,537-square foot villa unit located on a golf course, consists of a living room, a dining room, a kitchen, a screened porch, an open deck, two bedrooms, and two bathrooms. SSPR is a 330-acre resort community located at the northern end of Captiva Island, an island which, along with Sanibel Island, is part of a 15-mile chain of barrier islands on the southwest coast of Florida. Captiva and Sanibel *641 Islands are bounded on the south and west by the Gulf of Mexico, on the east by the San Carlos Bay and Pine Island Sound, and on the north by Red Fish Pass. Accommodations at SSPR include villas, cottages, and homes, each with views of either the beach and gulf, the bay, Red Fish Pass, a golf course, the tennis center, or numerous pools. Unit 1661 was under construction and not available for use during the period December 13, 1985, through February 12, 1986. As of February 13, 1986, Unit 1661 was complete. Consequently, for 1986, a nonleap year, Unit 1661 was available for use for 322 days. On March 21, 1986, SSPD executed a warranty deed to Razavi conveying Unit 1661, which was stamped as recorded by the Lee County Recorder on March 31, 1986. Therefore, beginning as of March 21, 1986, Unit 1661 was available for use for 286 days during 1986. On February 17, 1986, Razavi and South Seas Plantation Company (SSP) executed a guaranteed lease [2] agreement covering Unit 1661 for a 30-month term commencing on January 1, 1986. Pursuant to the lease agreement, Razavi agreed to make that Unit available for rent and SSP agreed to rent it from Razavi. SSP also agreed to occupy and use *642 Razavi's fully furnished and equipped Unit as a resort rental accommodation unit and to rent it to persons who would occupy it (patrons). Rates charged by SSP for the use of the Unit included "rack" rates, special rates, and package rates. Special rates and package rates often were less than the highest seasonal rates charged by SSP for units in SSPR. Razavi was under no obligation to enter into the guaranteed lease agreement. As a result of his executing the agreement, the personal use of the Unit by him and his family was restricted. The lease, however, did permit petitioners to use Unit 1661 for four weeks during the year at a nominal rental rate of $ 10 per day and for additional days during the year at 80 percent of the full published rental rate charged by SSP. The guaranteed lease agreement required SSP to pay to Razavi, *643 in monthly installments of $ 1,750 each, total annual rent of $ 21,000 (basic lease payment). Although SSP agreed to perform certain management, maintenance, and rental promotional services for Razavi, the guaranteed lease agreement did not require Razavi to pay SSP a fixed fee that was denominated as a management or similar fee to compensate it for those services. However, SSP was allowed to retain any rents it received from patrons to whom it rented Unit 1661 that exceeded $ 21,000 and that were below $ 52,501. Any rents that exceeded $ 52,500 were to be divided by Razavi and SSP on a 40 percent/60 percent basis. [3] Thus, the guaranteed lease agreement required SSP to pay annually to Razavi additional rent (additional annual rent) if 40 percent of the annual gross rental receipts SSP received from the use of the Unit exceeded the basic lease payment. Additional annual rent was defined in the lease as the amount by which 40 percent of the gross rental receipts exceeded the basic lease payment. Consequently, SSP was required to pay additional annual rent to Razavi when SSP's annual gross rental income from Unit 1661 exceeded $ 52,500 ($ 21,000 / .4). *644 As an alternative to the guaranteed lease program, SSP offered a second lease arrangement to unit owners in SSPR under which a unit owner agreed to make his or her unit available for rent and SSP agreed to offer it for rent. As was the case under the guaranteed lease agreement, SSP agreed to occupy and use any such unit as a resort rental accommodation unit and to rent it to patrons. As was also the case under the guaranteed lease agreement, unit owners were not obligated to enter into the alternative lease arrangement. The alternative agreement provided that SSP was to receive a fee for the services it provided thereunder, including renting and managing an owner's unit. That fee approximated 50 percent of the total rent SSP collected from patrons for the unit's rental. In implementing the alternative lease agreement, SSP did not guarantee a specific rental occupancy rate. Owners enrolling in this program agreed not to enroll their units in any other rental service program. In 1986, SSP received gross rental receipts of $ 29,558.98 from the rental of Unit 1661 to patrons. Since the Unit was under construction and not available for occupancy until February 13, 1986, SSP's *645 1986 basic lease payment to Razavi was made for an 11-month period, February through December, and amounted to $ 19,250 (11/12ths of the annual rent of $ 21,000). No additional annual rent was due Razavi for 1986. In 1987, SSP received gross rental receipts of $ 48,327.64 from the rental of Unit 1661 to patrons. SSP paid Razavi $ 21,000 as the 1987 basic lease payment. No additional annual rent was due Razavi for 1987. During 1986, Razavi and members of his family used Unit 1661 for 36 days. Nine of those days were attributable to the period occurring after February 13, 1986, and before March 21, 1986. During the period commencing February 13, 1986, when Unit 1661 first became available for use, through the end of that year, SSP rented Unit 1661 to patrons other than petitioners and guests of petitioners for 149 days or 46.27 percent of the days on which the Unit was available for use (149 days/322 days). (Hereinafter, the patrons other than petitioners and guests of petitioners who rented Unit 1661 from SSP will be referred to as renters.) Rates charged by SSP for the Unit during 1986 ranged from a low of $ 65 per night to a high of $ 320 per night. During 1987, Razavi and *646 members of his family used Unit 1661 for 27 days. During 1987, SSP rented Unit 1661 to renters for 200 days or 54.79 percent of the days on which the Unit was available for use (200 days/365 days). Rates charged by SSP for the Unit during 1987 ranged from a low of $ 107 per night to a high of $ 375 per night. Petitioners' expert witness, John S. Ross, Jr. (Ross), determined that the "fair market rent" payable to the owners of Unit 1661 during 1986 and 1987 was $ 21,000. In his report, Ross used the term "fair market rent" interchangeably with the term "market rent". We therefore assume that he intended the terms to have identical meanings. Ross defined the term "market rent" in his report to mean the most probable rent which a property should return to the owner in a competitive and open market, the renter and owner, each acting prudently, knowledgeably and assuming the rental amount is not affected by undue stimulus.
Quoting from a text on real estate appraisal, Ross further defined the term "market rent" as the rental income that a property would most probably command on the open market as indicated by current rentals being paid for comparable space (as of *647 the effective date of the appraisal).
Ross stated in his report that the above-quoted definition of market rent assumes, among other things, that the rental amount represents the normal consideration for the property returned to the owner after allowance for services included with the rental real property and that it specifically includes rent paid for personal property furnishings appurtenant to use of the subject property for resort rental. (Hereinafter, the market rent determined by Ross will be referred to as the fair market rent.) In determining the fair market rent of Unit 1661 payable to petitioners during 1986 and 1987, Ross examined (1) the gross rents generated in 1986 and 1987 by 16 units located within SSPR that he considered to be comparable to Unit 1661 and that operated under SSP's alternative lease agreement pursuant to which receipts collected by SSP from the rental of the units to patrons were divided evenly between SSP and the unit owners, and (2) the annual rents generated in 1986 or 1987 (and, in some instances, in both years) by eight units that he considered to be comparable to the Unit, one of which was located in SSPR and seven of which were located *648 outside of SSPR but within the Captiva and Sanibel Islands resort area. Ross utilized certain valuation techniques in determining the fair market rent of Unit 1661 during the years at issue. These techniques assumed that the annual rents generated by units that he considered to be comparable to Unit 1661 already reflected the rates of occupancy and vacancy in the resort area in question. During the years at issue, the annual occupancy rate of units that Ross considered to be comparable to Unit 1661 ranged from 39 percent to 49 percent. This occupancy rate reflected occupancy by patrons, other than the owners of those comparable units or guests of those owners, who in fact occupied those comparable units during the years 1986 and 1987 under various rental arrangements. The comparable units relied upon by Ross in determining the fair market rent of Unit 1661 thus had a vacancy rate during the years at issue that ranged between 51 percent and 61 percent. OPINION Section 280A in pertinent part limits a taxpayer's deductions with respect to the use of a dwelling unit, including a condominium, apartment, or similar property, if the taxpayer's personal use of the unit exceeds the *649 greater of 14 days or 10 percent of the number of days during the year for which the unit is rented at a fair rental (hereinafter sometimes referred to as the personal use ceiling or limitation). Sec. 280A(c)(5), (d)(1), (f)(1)(A). For purposes of this rule, if a taxpayer owns a unit during only a portion of a taxable year, no reductions in the personal use ceiling of section 280A(d)(1) are required. Sec. 280A(d)(1). Furthermore, a unit is not treated as rented at a fair rental on those days for which it is used for "personal purposes". Sec. 280A(d)(1). A unit is treated as used for personal purposes on any day if, for any part of such day, the unit is used -- (A) for personal purposes by the taxpayer or any other person who has an interest in such unit, or by any member of the family of the taxpayer or such other person; (B) by any individual who uses the unit under an arrangement which enables the taxpayer to use some other dwelling unit; or (C) by any individual, unless for such day the dwelling unit is rented for a rental which, under the facts and circumstances, is a fair rental. Sec. 280A(d)(2)(A)-(C).
If a taxpayer's personal use of a dwelling unit exceeds *650 the personal use limitation, the deductions attributable to the unit's rental are allowable only to the extent of the gross income derived from that rental. Sec. 280A(c)(5). The parties agree that if the personal use ceiling of section 280A(d)(1) were exceeded by petitioners with respect to Unit 1661 for 1986 and for 1987, petitioners' deductions in respect of that Unit would be limited by section 280A(c)(5) for each such year. The parties disagree about whether that ceiling was surpassed. We must resolve that dispute. Tax Year 1986
Because petitioners used Unit 1661 for more than 14 days during 1986, they will be below the personal use ceiling of section 280A(d)(1) for that taxable year only if they can demonstrate that the number of days of their personal use of the Unit during that year did not exceed 10 percent of the number of days in 1986 for which the Unit was rented at a fair rental (hereinafter sometimes referred to as fair rental days). On brief, petitioners point out that they did not acquire title to Unit 1661 until March 21, 1986, the date on which SSP executed the warranty deed for that Unit. Petitioners argue that we must therefore determine whether they *651 exceeded the personal use limitation for 1986 by examining the period commencing on March 21, 1986, and by counting as fair rental days all the days during 1986, including and following that date, on which the Unit was under lease to SSP. Thus, petitioners would have us compare the 27 days of their personal use of Unit 1661 after March 20, 1986, to the total 286 days remaining in 1986 after that date on which Unit 1661 was leased to SSP. Because (1) the contract for the sale of Unit 1661 and the addendum to this contract were signed by both Razavi and a representative of SSPD on or before January 7, 1986, (2) petitioners received from SSP $ 19,250 during 1986 representing the basic lease payment by SSP covering the 11-month period from February through December of that year, and (3) petitioners occupied the Unit on February 14, 15, and 16, 1986, respondent suggests that petitioners had the "benefits and burdens of ownership" with respect to the Unit as of February 13, 1986, the day on which the Unit was first available for use. Respondent argues that the number of days of petitioners' personal use of Unit 1661 should therefore be determined beginning with February 13, 1986. During *652 the period starting February 13, 1986, through the end of that year, petitioners personally used Unit 1661 for 36 days. Under respondent's analysis, we would determine whether petitioners exceeded the personal use ceiling of section 280A(d)(1) for 1986 by comparing the 36 days of petitioners' personal use of Unit 1661 after February 12, 1986, to 149 days, the number of days in 1987 for which respondent contends petitioners leased the Unit at a fair rental within the meaning of section 280A(d)(1)(B). Applying the flush language of section 280A(d)(1), we find that petitioners' personal use of the Unit in 1986 exceeded the personal use ceiling for that year regardless whether we rely on the date suggested by petitioners (March 21, 1986) or the date suggested by respondent (February 13, 1986). [4] That language provides that a dwelling unit is not treated as rented at a fair rental for any day on which it is used by the taxpayer for personal purposes. See sec. 1.280A-1(d)(2), Example (2), Proposed Income Tax Regs., 45 Fed. Reg. 52399, 52402 (Aug. 7, 1980) (days of personal use subtracted from fair rental days). If the 27 days of petitioners' personal *653 use starting on March 21, 1986, the date that petitioners urge us to use, were subtracted from the 286 days remaining in 1986 after that date, the maximum number of days during 1986 on which Unit 1661 could be treated as having been leased at a fair rental would be 259 days. Thus, assuming arguendo that petitioners were correct in arguing that we utilize March 21, 1986, in applying the personal use limitation to 1986, petitioners' personal use of Unit 1661 during that year (27 days) would have exceeded 10 percent of the maximum number of days in that year (259 days) for which the Unit could have been treated as rented at a fair rental under section 280A(d)(1)(B). *654 Petitioners would also have exceeded the personal use ceiling if we were to compare, as respondent argues, the 36 days of their personal use of Unit 1661 commencing February 13, 1986, the day on which the Unit was first available for use during that year, to 149 days, the number of days during that year on which respondent contends petitioners leased the Unit at a fair rental within the meaning of section 280A(d)(1)(B). [5]
*655 Accordingly, we sustain respondent's determination that the deductions claimed for 1986 by petitioners for the rental of the Unit are limited under section 280A(c)(5). Consequently, we need not address petitioners' position that they rented Unit 1661 to SSP at a fair rental for 286 days during 1986 within the meaning of section 280A(d)(1)(B). Tax Year 1987
Since the days of personal use of Unit 1661 by petitioners during 1987 (i.e., 27 days) exceed 14 days, in order to avoid the limitation of section 280A(c)(5) for that year, petitioners bear the burden of establishing that the number of days during 1987 for which the Unit was rented at a fair rental within the meaning of section 280A(d) (1)(B) equaled at least 270 days. [6] Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). *656 In resolving this question, we note that both the United States Court of Appeals for the Seventh Circuit and this Court have previously addressed the fair rental days standard in section 280A(d)(1)(B). Fine v. United States, 647 F.2d 763 (7th Cir. 1981); Byers v. Commissioner, 82 T.C. 919 (1984); Osborne v. Commissioner, T.C. Memo. 1987-553; Buchholz v. Commissioner, T.C. Memo. 1983-378. For example, in the Fine case, the taxpayer jointly owned a resort unit which he placed into a rental pool managed by the resort's management company. The taxpayer was to be compensated by a prescribed amount for each day on which his unit was available for rent to guests of the resort and by a larger amount for each day on which the unit was in fact rented to any such guests. In the Byers case, the taxpayers purchased two condominium units in a resort operated as a hotel by a limited partnership. As unit owners, the taxpayers in Byers were required to become limited partners in that partnership and to make their units available for rent to a rental pool operated *657 by it. Under the limited partnership agreement involved in Byers, unit owners were allocated earned rents and incurred expenses based upon predetermined formulae that related to the type of unit owned, regardless how often or at what rate the unit was actually rented to hotel guests. The taxpayers in both the Fine and Byers cases contended that their units were rented at a fair rental within the meaning of section 280A(d) (1)(B) for each day on which their units were available for rent through the rental pool, even though their units were rented to hotel guests for far fewer days. In rejecting the taxpayer's argument in the Fine case, the Seventh Circuit noted that the method chosen by the taxpayer in that case to allocate rental income between himself and other unit owners participating in the rental pool had no bearing on the fair rental days standard of section 280A(d)(1)(B). Fine v. United States, supra at 767. Instead, the Court of Appeals focused on the fact that the taxpayer's unit generated a portion of the funds in the rental pool only on the days on which his unit was actually rented to guests of the resort in which *658 that unit was located. Thus, the Seventh Circuit held that the taxpayer's unit was rented at a fair rental within the meaning of section 280A(d)(1)(B) only for the days on which it was actually rented, and not for the days on which it participated in the rental pool but was not actually rented. Id.
In rejecting a similar argument of the taxpayers in the Byers case, [7] *660 this Court also observed that the method chosen by the taxpayers in that case to allocate the pooled rentals between themselves and other unit owners participating in the pool was irrelevant. Byers v. Commissioner, supra at 927-928. We then emphasized that, in enacting the fair rental days standard of section 280A(d)(1)(B), Congress did not want the period during which a vacation unit is held out for rent to be considered in determining the number of days on which the unit is rented at a fair rental. Id. Consequently, we held, as the Seventh Circuit had held in Fine v. United States, supra, that the taxpayers' units were rented at a fair rental only on those days on which the units actually were rented to hotel guests, and not on *659 the days on which the units were held out for rent through participation in the rental pool but were not actually rented.[8]Byers v. Commissioner, supra at 927-928. As emphasized in Fine and Byers, the language of section 280A(d)(1)(B) requires us to examine the number of days for which a unit owner actually rented a dwelling unit at a fair rental. Petitioners contend that they rented Unit 1661 to SSP for 365 days during 1987 at a fair rental within the meaning of section 280A(d)(1)(B). [9] In advancing this contention, petitioners rely on the fact that (1) the lease between themselves and SSP provided that SSP agreed to lease the Unit for the entire year (i.e., 365 days), (2) the annual basic lease payment under that lease was $ 21,000, [10] and (3) petitioners' expert witness Ross determined that the *661 fair market rent for Unit 1661 for 1987 payable to petitioners was $ 21,000. *662 Respondent contends that, for purposes of applying the fair rental days standard of section 280A(d)(1)(B), petitioners rented Unit 1661 during 1987 for only 200 days, which is the number of days during that year on which SSP rented that Unit to renters. Respondent chose not to present any expert opinion on the fair market rent of Unit 1661 payable to petitioners. Nevertheless, she argues on brief that the opinion of petitioners' expert as to the fair market rent of Unit 1661 for 1987 is not determinative of the number of days for which Unit 1661 was rented at a fair rental within the meaning of section 280A(d)(1)(B) because that opinion was based on the assumption that there was an occupancy rate for units comparable to Unit 1661 of only 39 percent to 49 percent. Respondent also contends that Ross' opinion is unreliable because it failed to account properly for differences in the age and location between Unit 1661 and certain of the allegedly comparable units he chose from the Captive and Sanibel Islands resort area. Although we do not necessarily agree with respondent's latter contention that the opinion of petitioners' expert as to the fair market rent of Unit 1661 for 1987 *663 is unreliable, her first argument has merit. Assuming arguendo that we were to accept Ross' opinion of the fair market rent of that Unit for 1987, [11] we are still faced with the question whether, as petitioners argue, the fact that they received during that year from SSP an amount equal to that fair market rent necessarily means that SSP rented Unit 1661 from them at a fair rental for 365 days of that year. On the present record, we must answer that question in the negative. In arriving at his determination of the fair market rent of Unit 1661 for 1987, Ross attempted to ascertain the income that the owner of that Unit could have expected to receive during 1987, irrespective of the identity of the lessee. In determining that fair market rent, Ross examined (1) the gross rents generated in 1986 and 1987 by 16 units located within SSPR that he considered to be comparable *664 to the Unit and that operated under SSP's alternative lease agreement pursuant to which receipts collected by SSP from the rental of the units to patrons were divided evenly between SSP and the unit owners, and (2) the annual rents generated in 1986 or 1987 (and, in some instances, in both years) by eight units that he considered to be comparable to the Unit, one of which was located in SSPR and seven of which were located outside of SSPR but within the Captive and Sanibel Islands resort area. After making certain adjustments to those rent amounts to reflect (1) SSP's receipt of a portion of the gross rents and differences in location and view for the 16 comparable units operated under SSP's alternative lease arrangement and (2) the payment of management fees and differences in physical characteristics and location for the remaining eight units he chose, Ross determined that the owners of units that he considered to be comparable to Unit 1661 could have expected to receive income ranging from $ 20,300 to $ 22,000 during 1987. He thus concluded that the fair market rent of Unit 1661 for 1987 was $ 21,000. The valuation techniques Ross employed assumed that the annual rents generated *665 by units that he considered to be comparable to Unit 1661 already reflected the rates of occupancy and vacancy existing in that resort area. The vacancy rate for the comparable units he chose was in the range of 51 percent to 61 percent. Conversely, the occupancy rate for those units ranged between 39 percent and 49 percent. [12]
*666 Ross' opinion that the fair market rent of Unit 1661 for 1987 was $ 21,000 was thus premised on the assumption that the Unit would be vacant for approximately 51 percent to 61 percent of that year (i.e., for approximately 186 days to approximately 223 days). Therefore, on the instant record, we cannot accept petitioners' argument that, when SSP leased Unit 1661 for $ 21,000 during 1987, that Unit was rented to SSP for 365 days at a fair rental within the meaning of section 280A(d)(1)(B). On the record here, the only conclusion supported by petitioners' receipt in 1987 of $ 21,000 from SSP is that Razavi's arrangement with SSP was equivalent to renting Unit 1661 at a fair rental for approximately 39 to 49 percent of that year (the occupancy rate on which Ross based his determination of the fair market rent of Unit 1661 for 1987), or for approximately 142 to 179 days. This is far short of the 270 days required for petitioners to be below the personal use ceiling of section 280A(d)(1)(B). [13] *667 Petitioners have presented no evidence that supports a different conclusion. [14]
Based on the record in this case, we sustain respondent's determination that the deductions claimed for 1987 by petitioners for the rental of Unit 1661 are limited by section 280A(c)(5). To reflect the foregoing and the concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Our use herein of the words "lease", "leasing", or similar terms is for convenience only and does not necessarily reflect our view of the nature of the agreement between Razavi and SSP.↩
3. This is the same basis on which Razavi and SSP were to share rents received by SSP that equaled at least $ 52,500.↩
4. Consequently, we need not decide whether the starting date in 1986 for counting days of petitioners' personal use of Unit 1661 and days on which the Unit was rented at a fair rental within the meaning of sec. 280A(d)(1)(B)↩ should be, as petitioners contend, March 21, 1986 (the date SSP executed the warranty deed for the Unit) or should be, as respondent contends, February 13, 1986 (the date the Unit was first available for use).
5. On brief, respondent noted that petitioners' personal use of Unit 1661 during 1986 would also have exceeded 10 percent of the number of days for which the Unit could have been treated as rented at a fair rental if we were to compare the 36 days of their personal use commencing February 13, 1986 (the day on which the Unit was first available for use in 1986) to either (1) the 286 days remaining in that year for which the Unit could have been treated as rented to SSP (322 days remaining in that year commencing on February 13, 1986, minus 36 days of personal use), or (2) 329 days (365 days in 1986 minus 36 days of personal use).↩
6. As noted above, sec. 280A(c)(5) limits a taxpayer's deductions with respect to a dwelling unit if, under sec. 280A(d)(1)↩, the taxpayer's days of personal use of the unit exceed the greater of (1) 14 days or (2) 10 percent of the number of days during the year for which such unit is rented at a fair rental. The parties agree that petitioners personally used Unit 1661 for 27 days during 1987. Twenty-seven days equals 10 percent of 270 days and exceeds 10 percent of 269 days.
7. The taxpayers in Byers v. Commissioner, 82 T.C. 919 (1984), also attempted to distinguish themselves from the unit owner in Fine v. United States, 647 F.2d 763 (7th Cir. 1981), by pointing out that, in the Fine case, the unit owner received a varying percentage of rental profits depending on whether that owner's unit actually was rented to a hotel guest or was unoccupied but available for rent. The taxpayers contended in Byers that, in contrast to the facts in Fine, they received a fixed percentage of the profits and losses generated by the limited partnership operating the resort in which their units were located based upon the type of units they owned regardless whether their units actually were rented. The taxpayers in Byers argued that their distributive share of the limited partnership's rents and expenses therefore represented the "fair rental" of their units to that partnership. We rejected the distinction relied upon by the taxpayers in Byers, noting that their distributive share represented the average profit that the partnership derived from all of the units of a particular class, and not the fair rental of the taxpayers' specific units. Byers v. Commissioner, supra↩ at 927.
8. The rental pool arrangement and issues we faced in Buchholz v. Commissioner, T.C. Memo. 1983-378, were similar to those described in Fine v. United States, supra, and Byers v. Commissioner, supra. In Buchholz, a case appealable to the Ninth Circuit, we cited with approval the holding and reasoning of the Seventh Circuit's decision in Fine↩.
9. Petitioners argue that the calculation for 1987 of the personal use ceiling of sec. 280A(d)(1)(B) must be made by comparing the 27 days of their personal use of the Unit during that year to 365 days. As explained above, however, pursuant to the flush language of sec. 280A(d)(1)↩, the comparison under petitioners' analysis should be between 27 days of their personal use and 338 days (365 days in 1987 minus 27 days of personal use during that year).
10. Additional annual rent was payable under that lease if gross receipts from SSP's rental of the Unit exceeded $ 52,500. No such additional rent was in fact paid by SSP to petitioners during 1987. They received only the $ 21,000 basic lease payment for that year. Because petitioners were not obligated to pay SSP a fee denominated as a management or similar fee, we surmise that the difference between $ 52,500 and $ 21,000 represented amounts that SSP would retain from the rental of Unit 1661 to cover its costs (including management costs) and to generate a profit.↩
11. The Court has no reason based on the record here not to accept Ross' opinion of the market rent, as he defines that term, of Unit 1661 for 1987.↩
12. During 1986 and 1987, the annual occupancy rate of SSPR units that Ross considered to be comparable to Unit 1661 ranged from 39 percent to 49 percent. These comparable units thus had a vacancy rate during the years at issue that ranged between 51 percent and 61 percent. Ross testified that he chose comparable units both within SSPR and outside SSPR in determining the fair market rent of Unit 1661 for 1987. A review of his report indicates that he made no adjustments to the rents generated by those units in order to reflect differences in rates of vacancy. Neither petitioners nor respondent has presented any evidence that would cause us to conclude that the vacancy rate for comparable units in SSPR was different from the vacancy rate for comparable units in the entire 15-mile resort area in which Unit 1661 was located. Thus, on the basis of the instant record, we conclude that the vacancy rate for all the comparable units selected by Ross ranged from 51 percent to 61 percent and that the occupancy rate for those units ranged from 39 percent to 49 percent.↩
13. It is noteworthy that if petitioners had leased Unit 1661 to SSP under the alternative lease arrangement, pursuant to which rents generated by the rental by SSP of the Unit to patrons would have been divided evenly between SSP and petitioners, petitioners would have received during 1987 $ 24,163.82, or one-half of the total rents of $ 48,327.64 that SSP in fact collected from having actually rented the Unit to renters for 200 days during that year. We assume that SSP's portion of this $ 48,327.64 would have been used by it to cover its costs and to generate a profit. Thus, under the alternative lease arrangement, petitioners would have received more rental income from the lease of Unit 1661 to renters for 200 days during 1987 than they in fact received from SSP for allegedly leasing the Unit to SSP for that entire year.↩
14. The record does establish that during 1987 SSP leased Unit 1661 to renters for 200 days. We assume the rent paid to SSP by these renters represented a fair rental within the meaning of sec. 280A(d)(1)(B). Indeed, respondent is willing to concede that petitioners rented the Unit at a fair rental for 200 days during 1987. However, even accepting respondent's concession, petitioners exceeded the personal use ceiling of sec. 280A(d)(1)(B)↩ for 1987.